Texas and all the state petitioners. Because Congress creates agencies, Congress can say what agencies can do and how they can do it. Sometimes, however, agencies try to steal a base. They either take a statute that Congress has enacted for one reason and they repurpose it for another reason, or they cut corners on the procedures contrary to Congress's requirements in the Administrative Procedure Act of reasoned decision making. Here, respectfully, the SEC has done both. For more than 20 years, the SEC has required registered funds to file a form, form NPX, respecting proxy votes. And this form is the type of form that you would expect to come from the SEC. It's simple and non-ideological. You pick up the form and it reads like bread and butter corporate law. That's changed. As of July 1st of this year, there's a new form, NPX. Can I ask about how it works before the rule? Yes, Your Honor. Right now, all of the votes are disclosed in whatever order the companies want to provide it in. Is that right? Correct, Your Honor. Let's say you had a ESG type measure. Please adopt more ESG policies under the current rule. Yes, Your Honor. I take it that information is available, of course, to everybody. So if you're pro-ESG, you can talk about it and praise those funds that vote for it. If you're anti-ESG, you can attack those funds. The information is, in other words, there to both sides. Yes. Correct. The information is already available under the form. The difference— What's changed then? Because if the current rule is essentially transparency for all, it's not biased to one side or the other, everybody gets the same information. You can lobby against or for whatever policy you want. What has changed after— What would change if this rule went into effect? Correct, Your Honor. So what will change with the form is, whereas before it was just standard, you know, here's the date, here's the vote, this is what you do, now certain categories have been given special treatment. So some of the categories you would look through and say things like, okay, audits, whatever, but also things like ESG, you know, so for instance, the list, we have DEI, which is right there, human rights, climate change, other social issues. Why does that affect the information market, if you will? In other words, DEI is expressly listed, as I understand it, but if you're for DEI, then you'll want to support funds that vote for. But if you're anti-DEI, then you will only support those funds that vote against. Why has that changed the information market? Well, I guess two answers to that. In other words, the SEC isn't saying, you know, please, you know, support those funds that do do this. They're just saying this is a vote on DEI. It could be a vote on repealing DEI. Sure. I mean, I guess three answers, given what Your Honor just said there. The first there is, if the information's already out there, so if we posit that all the information's already out there, well, now there's extra cost for no purpose at all, because you know that the funds will have to go through the process of categorizing, and if they make a mistake, they're going to be subject to enforcement. So that's by itself is cost. But it's not about whether this is putting the thumb on the scale for one side. Correct. Correct. It's just, what do you need this for? It's a silly cost. It's an inefficient rule that provides no value to support if you already have the information. Correct. Correct, Your Honor. So under, you know, the first answer is, if that's all true, then it doesn't do anything. The second— Well, I suppose the argument would be, this makes it a bit easier to, you know, I've just randomly pulled up some of these NPX forms. Yes. You know, it never hurts to organize the information for the reader a little better. All right. So the first argument would be is, if it's already out there, the people who want it already have it. The people who don't want it already aren't looking for it, so it's just an extra cost. The second argument, and this is what's pointed out by the dissents at the SEC, is that in the real world, what's going to happen is, it's easier for the activists who are looking for this particular information, now they can find it easier. So essentially, it's not, you know, not doing anything, which is, you know, the first hypothesis is we assume it doesn't do anything, it's just a cost. The second is, it actually is doing something, but it's only giving something to the information to a certain group of shareholders, not your kind of your regular shareholder who invests in a mutual fund. I mean, respectfully, Your Honor, people that I know, ordinary investors, they invest in mutual funds because they want to retire and they want their kids to go to college. They're not investing in mutual funds because they want to influence DEI policy. So I think, but there are certain people who do. Right, but wouldn't those people, if you suppose, as many do, that those policies are bad for investors, then you would want to know that your fund votes no on DEI. Correct, Your Honor. But what I'm trying to understand is, why is providing the information in a slightly more efficient way, why does that have a distortive effect on information? So that goes to the… Ekram Maswamy, I think, has an anti-ESG fund. I assume he would enjoy having this information a little bit more available. Well, I guess before I get to my third point, I would point the court to the DC Circuit's decision in Chamber of Commerce vs. SEC and Business Roundtable vs. SEC. I guess Business Roundtable in particular. There they say, well, there's certain types. Shareholders is a broad term. There are shareholder investors that just want returns, which is kind of the basis of the Howery test of what is a security. It's for profits. There are other investors who have special interests, for instance, they are a union or they are an activist or whatever, so they're not looking at securities for the same reason that the ordinary investor is. Or Christian funds that want Christian values. Correct, Your Honor. ESG funds. Correct. So it's true that there might be activists on both sides of particular issues that are looking for it, but there's a third group, and the third group are the people who just want returns, and they want their investment manager to just base their investment decisions without being skewed one way or the other by the pressures that will come from either side of the aisle. They might want the ESG information so that they can focus on funds that vote against ESG. Correct, Your Honor. And that's the point I was trying to make, is there are activists or maybe even people who are inclined for financial reasons to think they can beat the market and think, I think this particular fund is just going to underperform, so I want to know that information. But what I'm saying, and it's going to not just be me that dissents at the Commission, there's a whole other group of investors, and these are the investors that just want returns. And part of the problem with this, the whole kind of project that we have here, is there is a notion out there that those people who just want returns, somehow they have to be more interested in what the funds are doing. And that's really, I got to point the court to Commissioner Pierce's dissent, where she just says it's just not true. There are people who just want ordinary bread-and-butter corporate law, and I think you need a response from that, from the agency, to say why it is wrong. The highest order of what we're doing here isn't voting for voting's sake, or even for these important policies. For a lot of people, it's just for returns on their investments. We're talking, you know, $35 trillion from their brief and mutual funds. But assume I'm wrong about all of that. Let's just assume I'm wrong, like we don't think we are, but let's assume that I am. The most straightforward reason why this rule, even if everything Your Honor is saying is correct, why this rule is arbitrary and capricious, is because they focus on 2020. And this, you know, as I kind of pick up the case, I see no justification for it. So you have these different categories, which, you know, the staff put together without ever turning over the data, explaining how they came up with the categories from the data, contrary to one of the dissenting commissioners saying it's a mystery how you did this. They came up with 2020, and they said these are going to be the categories we're going to use based on what we saw in 2020. And at the time, contemporaneously with that, commissioners said, but 2020 was an outlier year. And commentators said that as well. 2020 was an outlier year. Your categories are immediately going to go stale. So you're going to have to make the funds pay to compile information in certain categories that investors don't even want. So that's a problem, right? That seems like a pretty straightforward problem in administrative law. So now it's incumbent on the SEC to explain why they picked 2020, or at least come up with a good answer to the commentators and the commissioners. And their answer is, well, we had 17 categories that we got from 2020. Now we have 14 categories that we got from 2020, which is not responsive at all. I mean, the problem is you're using 2020. It's maybe less arbitrary and capricious to have 14 rather than 17. But it's still arbitrary and capricious because the problem is. Anchoring problem. Exactly right, Your Honor. And it's going to be locked in place for years. Do you have evidence that had they used a five-year or a 10-year horizon, the categories would be very different? We do not, Your Honor. But I would point the court to Commissioner Reisman's dissent, where he said, well, why don't we use a rolling average? Now maybe it's not true. Maybe everything would have been the same. But the point of reasoned decision-making is you'd have to respond to a commissioner. And that, I would point the court to the D.C. Circuit's decision in the Chamber of Commerce for the SEC, where you had a position from a dissent. They didn't respond. And the D.C. Circuit said, well, that's arbitrary and capricious. That's a violation of state farm. Counsel, would you turn to standing? Of course, Your Honor. Do you have any thoughts on that? We sure do. I was surprised when I saw how verificiously they went after standing here, given the concession in the rule and in the proposed rule that, and I could point the court to the page here, this is in the proposed rule, in Appendix 27, any portion of these costs not borne by a fund's advisor or other sponsor will be borne by the fund's shareholders. They go even further in the final rule, this is in Appendix 73, they say essentially what they just said in the proposed rule, and then they go further. The costs borne by funds will be borne equally by all their investors. There's no hedge about it. Well, isn't there a hedge by saying any costs not borne by? Well, correct, Your Honor. That's the first part of the sentence. It's when they say— It's the first part of the sentence, and it doesn't suggest that there will be costs passed on, it seems to me. You may be reading it differently. It seems to me contingent. If there are costs not borne by first group, they'll be passed along. So, Your Honor, that's the first part of the sentence—the first part of the paragraph, I think, says that. The second part, even that hedge disappears. So I would say, like— Well, they're only talking about the other part after the hedge disappears. If there is another part, here's where these costs will go. Sure. Okay. So, again, I would say, Your Honor, say I'm wrong that the— Well, let me say, is there any evidence in the record, other than maybe two student notes, which may not be evidence, is there any evidence in the record about these costs, and particularly whether the costs are derived or created by the part of this that you're challenging? Yes, Your Honor. So we have the three declarations from Texas. We also have the comment letter from Utah, which is signed by the auditor and treasurer of Utah. I would also—you know, there is the language from the rule itself. Utah, in its comment letter, said, You're increasing management costs. The SEC—and Utah cites the relevant provision in their letter from the SEC, where the SEC says management costs, when they increase, you know, affects investors. So the SEC elsewhere has said that. But I'd also point the court—this is the one that I was just, you know, as I was preparing for argument. This is from the Second Circuit, NRDC, the National Highway, common sense and basic economics. If you have a fund, and you have to increase the costs, and they are in a competitive market, which the funds very much are, well, they're going—the costs are going to be passed through in the ordinary course. I would say, you know, in my old job as an antitrust lawyer, it's often the case where you have to assume that people are going to follow the basic rules of economics for standing to make sense. Otherwise, antitrust standing and the distinction between antitrust standing and Article 3 standing make no sense if, in fact, you don't assume that the costs are going to get passed down to the next level. So for me, I say, like, I look at what they say, I look at our declarations, I look at the declaration from Utah, I look at the cost reference to the SEC's own guidance about how this works. I also understand just economics. We're talking $35 trillion in funds. Texas itself invests hundreds of millions of dollars. The idea that costs—we don't even know why—the idea that costs are not going to be passed on to the states, I just don't think is very credible. Is there any evidence quantifying the costs of complying with this part of the rule to know whether it's de minimis and would not be passed on? I mean, it seems like there are assumptions in what you're saying that you may be able to tell me are not assumptions. Well, I mean, other than we have declarations, which, to be fair, remember, this is submitted within the timeline to file suit, so we have a very limited time to file suit, and the rule was kicked off quite far in the distance. So our declarants said this is how things ordinarily work, which I think all they can reasonably do. But these are the direct costs, and they have quantified some of the direct costs. We think that their numbers are quite low, that, for instance, they're saying that it's going to cost, like, $370 an hour to do this. You can't get a Skadden first-year associate at $370. It's just not realistic. But these are just the direct costs. What's a more realistic fee? Oh, that's correct, Your Honor. No, I'm asking. You're telling me $370 is not enough for Skadden? How much is? Oh, I'm sure at Skadden, I imagine the first-years are probably about $600 at this point. Maybe Judge Ho suggests maybe even more than that. That's more than we charge. Anyway, keep going. But I'd also like to point the Court, Your Honor, to also the indirect costs. I don't think there's any dispute that the parties that are most likely to be affected by the rule, again, you can point to the SEC's own commissioners, it's going to be Exxon or some of the other oil companies, which are the target of the climate change in particular. The Court can take notice of the fact that Exxon is suing some of these very people because they are subject to ongoing attacks. That's one reason, by the way, that this case is so important for Texas and some of the other states that are for the Court. It's not just our own pocketbook injury, although that is sufficient. It is our industry. These are the people of Texas and the industries of Texas and the other states that are part of this coalition here that are going to be affected by this. And again... The Perrins-Patriot type theory? Well, correct, Your Honor. It's the Perrins-Patriot theory. But even if... Is that still available after the Supreme Court's gone back and forth on this right? We certainly think so, Your Honor. But at a minimum, it's either available as a pure action by the state on behalf of the people and the state's quasi-sovereign interests, which I would point the Court to Kentucky, the Biden, the vaccine case, which I think is the best discussion of where the current state of the law is from Judge Bush. But they say I'm wrong about that. Okay. Well, then give me Massachusetts v. EPA on my own traceability arguments, which should be sufficient. I can't lose coming and going. So if that's where the law is, well, then Massachusetts v. EPA is squarely on the ordinary standing with extra solicitude for the states. Well, then we'd satisfy traceability there as well. I realize my time has expired, Your Honor. Thank you for your patience. I think we have another question for you, and I'm eager to hear what it is. So I'll follow your lead in terms of how many questions I have, but I do have quite a number on the standing issue. So I fully accept the economic theory that costs are typically passed down. Likewise, I would ask you first, would you accept that there is some sort of threshold below which the directed, regulated party isn't going to pass it down, because it's just not worth it. It's too small. We're not going to bother our customers with this cost. There is a de minimis range that is— I mean, as an economics matter, I'm not sure that's true, because it's all going to get lumped— You're saying all costs are always passed on? No, Your Honor. But respectfully, it's going to be very hard to isolate what the cost was from this when so the costs are going to get passed down as management fees. But conceptually, Your Honor, I agree with you. There might be a point where that's a dollar or something, and it's not out throughout— It would look silly if you passed on that cost, right? Correct, Your Honor. Here's where I'm going with this, is what is really the burden at the fund level? I mean, I really have two thoughts on this. One is, is it really all that difficult for the fund to change its computer programming so that the format is, you know, instead of by numerical order of the ballot votes, it's now done by subject matter vote? A, is that really a significant cost for the fund? And B, won't the companies themselves—you know, they're the ones who produce, I assume, the list of ballots or the list of proxy votes—won't these just be organized for the funds by the companies themselves? Or am I just completely wrong about that? This is not my area. I'm not sure that's how it would be done exactly, but— Do you get what I'm saying? I do get what you're saying. How taxing is this on the fund? I mean, respectfully, Your Honor, there is a premise in your argument that I want to challenge, and that is the states aren't challenging the requirement that the funds use the same language as the issuers or that they have standardized data. That's not our challenge. Right. It's just about the categories. It's just the categories. Correct. It's just the categories. And here I would— That's one of my points. Yes. How hard is it to—you know, is it a copy and paste at most by the funds? And are they even having to do it, given that the companies will probably organize these ballots for them? Well, I would point the Court— Speculating, admittedly. Yes. So I would point the Court to the statement that I submitted on Friday, the dissent from Commissioner Pierce. She addresses this very point. Nowhere responded to, by the way, in the rule, which by itself is a violation of arbitrary and capricious. But— Extra time to the other side for all this. Well, we'll see if they need more time. We'll play it out. You're right. He's getting extra time. And certainly, the SEC can have what time they need. All right. So if it is—this would be on page 2. I'm reading from here. Since fund investors are unlikely to be reporting over these reports, maybe it does not matter    She addresses this very point. Nowhere responded to, by the way, in the rule. Which by itself is a violation of arbitrary and capricious. costs and categorization anxiety, rather than run the risk of being second-guessed by exams enforcement, in other words by the SEC and third parties, funds will likely err on the side of caution and do the work because they don't want to get sued or have the SEC come after them. So it's easy afterwards to say, if you look at like a submitted report or something that's filed with the Court, oh, well, that was very simple. But in fact, if you're worried that you're going to be second-guessed by the SEC or activists or other investors, you're going to spend a lot of time. So in theory, it looks very simple. Oh, obviously, this falls in Category X. Whereas in fact, in the real world, we all know that that's going to take a lot more time and effort, and some senior eye is going to look at it, especially on the close judgment calls. So there's going to be real costs. I don't think they even dispute there's going to be a cost in that sense. All right, counsel. Thank you. Thank you, Your Honor, for your indulgence. We did give appellants extra time. We're not urging you to take extra time, but we'll give you such time as you need. I appreciate that, Your Honor, but I will try to be as brief as I can. In 2003, the Commission required registered investment companies to disclose their proxy voting records on a newly created form, Form NPX. And at the same time, it also required funds to disclose the policies and procedures that they used to vote proxies. As the Commission explained at that time, funds' ownership of public companies was becoming increasingly concentrated, and since then, that's continued to be true, and funds hold the ability to affect the outcome on many matters put to a shareholder vote. In 2021 and 2022, the Commission proposed and adopted a number of amendments to the form to make the information on the form more useful and usable so that investors could better understand how the funds they invest in were exercising their voting rights. These commonsensical changes include things like tying the fund's description of a voting matter to how the issuer describes that matter, reporting data on Form NPX separately by series of shares, and using a structured data language that's machine-readable. Petitioners challenged none of those amendments. Instead, they only challenged the Commission's decision to require funds to categorize voting matters by using a list of standardized categories that reflect the types of matters that funds frequently vote on. To begin, this Court lacks jurisdiction to consider the challenge at all because the petitioners have not demonstrated that they have standing to challenge the categorization requirement. Only the state of Texas has submitted any evidence that even attempts to demonstrate that it has suffered a direct injury, but this evidence amounts to nothing more than speculation. There's simply nothing that connects the dots between, on the one hand, any generalized costs that the final rules as a whole might impose on the broader mutual fund industry, to on the other hand, any increased costs that a fund will pass on to Texas as a result of the categorization requirement. The petitioners also claimed that they have parent's patriarch standing based on injuries to in-state investors and industries, but as the Supreme Court has stated, a state may not bring a claim based on a quasi-sovereign interest asserted on behalf of the state's residents against the federal government. But even if the Court were to conclude that any of the petitioners have standing, their challenge to the categorization requirement would still fail. Under the APA, the Commission's choice of categories was both reasonable and reasonably explained. So why 2020? Your Honor, I would say if you look at the proposing rule, what the Commission stated was that it was based on the staff's experience and review of 2020. It's not explicitly stated, but that was the last year for which a full year's data was available. If you look at A-9, that's the explanation. I would say also, if you look at A-10, you see the— I mean, you understand the question, right? Yes. Because ordinarily, you don't want to just use one data set because that's potentially anomalous. You know, every statistician in the world would tell you the bigger the sample size, the more predictive, the more reliable your ultimate analysis. So what's so special about 2020? When you pick out a year, you worry that the decision-maker is gerrymandering. Your Honor, I can take the point. What I would say is, I think if you look at A-10, you know, the question that the Commission was trying to answer, what are the reasonable categories? You know, it looked, in its proposal, to the most recent year at which a full year's data was available. If you look at—on A-10, you see the questions that it's asking of commenters, including, you know, are these the categories that make sense? Are there other categories that we should add? Is the subcategorization requirement too burdensome? And it received a number of comments from a variety of market participants, some agreeing with the categories, some saying that both the number of categories and the subcategorization requirement was too narrow. I think I would especially point this Court to the letter from the Investment Company Institute that's at A-183. I think it expressed those criticisms of both the categories and the subcategories being  be designed to sort of make them more evergreen, less likely to change, you know, more likely to be representative of a broader range of years. And I think if you look at the Commission's discussion from this issue on A-54 to A-56, that's exactly what it did. And I think, you know, especially footnote 94, the Commission, it recognized that it's not the case that any list of categories is going to be perfect. I mean, it might not be a perfect list, but the changes that it made— I agree with you, nothing is ever perfect in life, but don't you want to get as, you know, a higher quality as possible? Focusing on one year is a very narrow snapshot. It begs suspicion. A couple of responses to that. I think the first point is, again, you know, 2020 was a starting point. It certainly was not the end point, and the end point was informed by, you know, comments from various market participants about the categories that would make sense that reflected what funds were actually voted on. And I think the second point is, there's been no—this might be a different situation if there were any commenter who offered specific data that different years might look different. I mean, there was, I think, general speculation that it might be somewhat of an outlier year. I think no commenter suggested any data that indicated that a broader review would be any different, and understanding that this is not in the record, but I think events since then have suggested— I think we can agree 2020 was, at least in the broader world, a very unusual year for many, many reasons. I've not checked, but I'm assuming that that is reflected in how proxy votes took place, or do we— Your Honor, again— Would you disagree with that? I've not checked. I don't know. I would say it's not in the data that's in the administrative record. A couple of points I would say, again, there's no data that I think the unusual circumstances— The lack of data, how does that cut, though? Because I assume—I need to remember—I assume the 2020 objection was raised in the to rebut that. You're saying there's no data one way or the other as to whether 2020 is anomalous. How does that cut? I think it cuts in the commission's favor, again. I think, again, what the commission did, it looked at the most recent year. It made categories based on that suggestion, and it turned to commenters for the ultimate question— If people object 2020 is anomalous, and there's no data to rebut that, how does that cut in the commission's favor? I think it cuts in the commission's favor because commenters offered suggestions of ways that it could sort of—the commission could insulate against the concern that it might be a non-representative year. Again, and that's making the categories broader. Again, if there were fewer categories, it eliminated the sub-categorization requirement entirely. I would submit that many of the comments who were focused on it being an unrepresentative year were especially focused on the risks of sub-categorization rather than the risk that any specific category in that, you know, might suddenly just fall off entirely. And I would submit also—I apologize. I would submit also, the ultimate question, again, I think is whether the commission's choice of categories was reasonable, and again, I just think the story here of the commission sure looking to the most recent data, following the advice of commenters that was in the record for categories and sub-categories, what categories that would make more sense, eliminating the sub-categorization requirement. That's actually where I was going to go, because I heard opposing counsel make the But I hear the argument from opposing counsel that actually these categorization calls are going to be a matter of not only judgment, but I can actually see that there will be some difficult judgments. So let me ask a few questions. One, suppose there's an environmental racism ballot measure. How would you categorize that? Your Honor, I would submit a couple of things. The requirement is that you're supposed to check all of the categories that apply. So the extent that there are different categories that you might arguably apply it to, you might select both. I would submit also that if on . . . Oh, how does that . . . I'm sorry. I just want to make sure I understand that. So your idea would be the ballot measure would be listed twice or, theoretically, listed multiple times, listed every time it potentially satisfies a category? I wouldn't say that you listed multiple times. I think in the way that this is structured, you're going to essentially check a box for every category that it applies to. I don't think the reporting of this is going to be . . . you know, one of the changes that was made to the form, it's going to be in a machine-readable language, which basically means that you're submitting a data file. So one of the things that you're going to do, you're going to essentially check the box on which is which, or which category it applies to. So the one I just mentioned, environmental racism, you would check environment and you'd check DEI and maybe human rights? I can't say that I know for sure. I mean, that might well be the right answer, but I would also . . . Isn't that sort of a telling answer, though, is this is not that straightforward? Well, your Honor, a couple of responses . . . It sounds like the costs are starting to increase as we talk. Your Honor, I would say a couple of responses to that. Number one, part of the reason that the Commission made the changes that it did was a concern that was expressed about the number of subjective judgments, that the more granular you get, the more . . . you know, if you're subcategorizing, you had to put it into subcategories, that might be more difficult. It might be more difficult to do, and because of the differences in subjective judgments, you might be reducing the benefit to investors if different fund managers categorize things differently. So, again, it's not the point that . . . there's not zero judgments that might need to be made. There's not zero disagreement that people might have, but the Commission was well aware of this concern and made amendments to the proposal that were . . . Where would sexual harassment go? I'm sorry? Sexual harassment ballot vote. I . . . I'm not sure off the top of my head. I don't want to speculate on behalf of, you know, what funds might do. I mean, arguably, maybe other social issues. Abortion. There's another category, but again . . . Abortion. Perhaps other social issues again, but again, I would say that the Commission, again, was well aware of the risk that categorization might require difficult judgments and made a number of changes to its proposal to account for that difference. If I can, I'd also like to turn to standing. I would submit that, you know, the evidence that the petitioner submitted here, it really boils down to one paragraph and one declaration. This is at 8277, paragraph 4, and the paragraph is essentially that, you know, some investment advisors . . . I'm sorry, some mutual funds will be enhanced subject to the enhanced reporting requirements. Texas Trust may incur additional expenses due to the enhanced reporting requirements as the managers of such mutual funds are generally inclined to pass such expenses on to the fund investors. I would argue, Your Honor, that this does not meet the petitioner's burden, especially as they are not the direct objects of the final rule to demonstrate that they have standing. As the Supreme Court has made clear, as this Court has made clear, especially when standing is depending on the decisions of independent third parties, we're not before the Court, it is especially important that that be justified with evidence so that it is not speculative, and I think that's all . . . But why . . . What you have in response to the exchange we had with the opposing counsel, what we're talking about here is just normal economic theory, that you incur these costs that pass along. It seems one of the questions is who is going to be bearing these costs initially? Is it going to be the mutual funds or is it going to be somebody else? Is there anything in the record about how in the past, or currently I guess, these sorts of . . . who pays for the creation and documentation that goes into the forms, and will that change if this new rule goes into effect? Your Honor, I would say that there is no evidence in the record, and certainly none specific to any of the mutual funds that Texas invests in. What I would say is on a letter submitted by BlackRock, who is a preparer of form NPX, what they say, and this is on A227, that they already categorized votes for certain purposes. They already what? The quotation is, in their proxy voting reporting, they already categorized votes for certain purposes. That's not to say it's going to match perfectly on to what they're required to do under this rule, but there might be some mutual funds that already do things that are very similar to this. How does that prove exactly, though? Because I'm assuming opposing counsel will say, yeah, and they're already passing on the costs. Well, I would say . . . Now, of course, it's mandated now. It's costs mandated by SEC as opposed to done on a discretionary basis by BlackRock. Sure. I think it just goes to show the point that, in this case, you know, Texas bears the burden. You know, they need to produce evidence that would carry, you know, equivalent to a summary judgment burden. Why isn't the commission estopped by this statement about costs that we discussed earlier? Your Honor, I would submit the specific statement on A73. I would say, you know, the beginning of the sentence is, any portion of these costs that is not borne by a funds advisor or other sponsor will ultimately be borne by the funds shareholders. So, again, the commission is not speculating. You know, I don't think we're . . . we're not here to dispute the point that, you know, it's a general matter that regulations imposed by the commission that require people to do things are free. We're not disputing that, but what we are saying is that it is Texas' burden to show how they will be injured from this specific requirement, and I think nothing the commission said, you know, speculated on which actor in the mutual fund space might ultimately bear the costs, you know, any specific mutual fund, how they're arranged. And just as evidence you might think would be useful, I think, to try to do this, just to demonstrate, I think, the lack of evidence in the record here, it's not in the record that any mutual fund or ETF that Texas trusts or any of the other . . . or the other enemies invest in. It's not in the record that those funds charge fees to investors at all. Just sort of, I think, the basic things that you would need to prove a substantial risk of injury to Texas. It's just not in the record at all. And I think the case that would best exemplify this would be the Department of . . . or Louisiana Department of Wildlife and Fisheries case. I think in that rule you had an agency action that estimated, you know, there was an economic impact statement that estimated the cost of acquiring, you know, additional equipment on certain, you know, for shrimp, shrimping vessels. It estimated the cost both of adding the equipment, the cost in reduction of revenue. But nonetheless, the court said that Louisiana was required to submit additional evidence that would be specific to its own shrimp harvest, you know, specific to Louisiana's situation, that it wasn't just enough to rely on the general statement of . . . general statement from the agency about costs that might be imposed more broadly. What are you saying the state should have introduced into evidence to support the argument that these costs would be borne in part by them? Sure. I think, again, you know, there's information, I think, about, you know, number one, establishing that these mutual funds . . . Would they need to get an affidavit from someone? And if so, who would that be? What kind of entity would need to prepare an evidence restatement in some form? Your Honor, again, I wouldn't, you know, I'm not here to say that any specific type of evidence would necessarily carry the burden for them, but I would think, you know, information about more specific mutual funds that Texas invests in, how they've handled, you know, any things that are available to them include, you know, the fact that those mutual funds would charge fees to investors. It is also in registration statements and other publicly available information. Mutual funds are required to summarize material contracts that they have to provide administrative services. In some cases, they also submit those as exhibits. So just information that would allow this court to conclude, you know, based on things other than speculation, perhaps how they've handled, you know, past changes in regulation or other additional reporting requirements, just something that is actually evidence in the record that would allow this court to, you know, to understand why these particular reporting requirements would be passed along to investors as opposed to other things that would not be passed along to investors. What if a fund mischaracterized a valid measure, put it into the wrong category? Your Honor, I'm, I'm, I'm not sure exactly what would happen then. My understanding— The reason I ask, I understood the opposing counsel to say that the Commission would at least be able to impose some sort of liability for, for mischaracterization, and I'm just asking if you all— Your Honor, I, I, I would say, you know, first of all, of course, that's not an argument that they made in the briefs anywhere about why that might support standing. Um, second of all, I, I would have— It's a way to get to costs, right? It's, it's, it's, you know, the more risk there is to miscategorize, the more a fund is going to pay, uh, I don't know why Stanton got all the attention today, but, uh, you're going to pay law firms to, to protect yourself, uh, if there is a real liability. So I'm asking, uh, what is the liability risk as far as you can tell? Um, Your Honor, I, I, I, I can't say. I'm, I'm, I'm honestly not sure about the exact, you know, if there's a risk enforcement. I would, uh, I can't stand in here today and say that I know for sure about that. Okay. Um, the last thing I would like to turn to, um, I understand my time is getting low, of course, if Your Honors have no other questions, um, just the, the Commission did discuss, I think, the, the argument that, um, mutual funds might, or the information in these forms might lead to the risk that mutual fund and mutual fund advisors would violate their fiduciary duties. I think, um, first of all, the Commission discussed, and I would point this Court especially to Foote's notes, um, 281 to 284 in the surrounding discussion, it talked about the risks, um, that, um, mutual funds and mutual fund advisors, um, might vote securities in for reasons other than in the best, other than in the best interest of clients, um, and I think the Commission's conclusion, you know, was that the amendments to the form, which would improve information given to investors, would allow them to, you know, better understand how funds are voting proxies, if it's, you know, it's, it's much more easy to track how particular mutual funds are voting under this form about specific issues, and I think, you know, the how, you know, the mutual funds and mutual fund advisors are voting on matters that reduces the risk of conflicts of interest based on the better oversight they can have. Can you spell that out a little bit, though, because the, the information, you've had 20 years of experience with these forms, uh, all the ballot measures are available, uh, surely there's an industry out there that helps, uh, funds analyze, uh, what these ballot measures are. In other words, isn't there somebody out there in the marketplace already telling you here are the ESG measures, here are the DEI measures, you know, Bloomberg or somebody, this is not difficult right now. Uh, Your Honor, I would, I would agree that it, what the Commission said, I think at different points in the release, and I would, um, point especially, I think, to, um, page 71, um, pages 70 and 71, um, it's not the case that none of this information is out there. I would think the, the Commission, one of the major motivations for this rule was that, um, Your Honor stated that you would actually pull out these forms, they can be extremely long, um, because they're not, um, in a structured data language, meaning that they're not in a form that you can just sort of spit out and output to, you know, say Excel or something to more ease. You're trying to make, you're making it more convenient. That's exactly right, Your Honor. Is it, I guess what I'm asking though is, is it really all that inconvenient now, uh, just to the extent that there's a cost-benefit analysis that you always apply to rules, the that you are imposing some reasonable, some, some, um, substantial costs in terms of figuring out how to do these categorizations, uh, what is the benefit here given that, I assume people know exactly what they're voting for, uh, and, and there are industry incentives to, to help figure out what, you know, ballot measure 423 means and the fact that it's an ESG or a DEI or anything else. Sure. I, I think I would point this Court, um, to I think a couple of common letters, um, the first of which is from Bloomberg and this is at 8244. I mean, the quote is, categorized proposals are extremely useful. It makes the data richer and significantly lowers the cost of consumption. I mean, so there is evidence in the record that doing these categories on top of the other types of, um, types of amendments that the Commission was, um, I see my time has  No, you can answer the question. Thank you, Your Honor. And, um, the other types of amendments the Commission, um, imposed were really just designed to make it easier for everybody in the marketplace, whether that be investors, the Commission noted that even if retail investors might not make use of NPX, other parties, you know, Morningstar, other, other users of NPX, this will also make it easier for them to analyze that data. Thank you, Your Honor. All right, counsel. Thank you. Thank you, Your Honor. If I may, I would like to return to 2020, um, and the language that, uh, the, the, they used. This is from the SEC. This is on page appendix nine. Based on our staff experience and review of the matters on which funds voted in 2020, that is the extent of the explanation for why 2020 was picked and was, was selected. I hear counsel now saying that it was because that was the most recent data. Well, that's about a clear violation of Chenery, as I've seen, um, that is a post hoc statement from counsel at the podium. Um, they said it was because, um, that was what our staff looked at in 2020. Um, that is the record, that's where it stands, and they never turned the data over either, which by itself is another pretty bright line violation of administrative law. If you're going to turn, if you're going to have data, you turn it over for comment. They didn't do that. And a third, kind of, these are just admin law 101, you had a commissioner tell them, hey, I don't know how you came up with this, to which they said nothing in response in the final rule. I said, this is the easiest way for the court to vacate the rule is, is for this reason. Uh, there's other things we think deeper problems with it, but the most straightforward is this. Uh, I would also say that I hear counsel saying, well, there's benefit to categories. No doubt. Surely there's benefit to categories, and if they had done it correctly, some of these categories, Texas and the other states probably would not be here. If they had said, we're going to have categories about audits or about, you know, kind of bread and butter corporate things, we're not going to be, but the problem is they picked an outlier year, didn't justify it. Um, their process was wrong from the get go and they have to go back and do it again. That's, I think the most straightforward way for the court to resolve the case. What if they had just said social issues or just one category so that you don't have to put sexual harassment in multiple categories and environmental racism in multiple categories, just one, you know, bucket with that object to that? Well, I mean, I would point the court again to commissioner Riceman statement at the time where he says, well, it's just going to be so stale that essentially everything's going to fall in this category. We already have a miscellaneous category now and it's, everything's going to end up in that same bucket anyway. Um, so I think that's, I mean, it'd be better maybe, I don't know for sure, but I don't think it would solve their problem. I think they just need to go back and do it right if they're going to do it. Um, I also want to talk about costs, which I think are relevant for you. One quick record question. You quoted something just now about some total of their response to 2020 where is that in the record? Correct. Um, this is appendix nine, uh, 86 fed reg, uh, five, seven, four, eight, six, uh, where they picked that as their explanation. Um, I don't see very much explanation at all in the final rule that was in the proposed rule. Um, I also talk about costs being real, uh, which I think matters for both standing and the merits, um, at the podium, um, counsel for the other side does not know where things, how to categorize these things. Well, we know in the real world that means that people right now who have been listening to this argument are, their costs are going up as we speak, um, because that's the nature of legal uncertainty. If it, because if you don't know what it's going to be or whether the enforcement action is going to come, we have a statement from a commissioner that you need to be worried about categorization anxiety. Well, that's what we're talking about. There's a risk that's happening in real time, um, which I think is sufficient for standing. It also shows why they need to go back and do this again. Um, real state, a penalty for mischaracterization categorization. Is there a penalty set out in the real? I don't know what exactly the penalty enforcement provision would be. There are obviously enforcement provisions of registered funds don't do what their registered requirements entail. I don't know exactly what the, what the SEC would do here. Um, but there's nothing in this particular rule of sale that says if you misreport, here's what happens. No, Your Honor. I mean, the SEC does quote as general, um, powers, which are given, which are the catch all provisions that they have, which they cite as a justification for the rule, but also surely applied to the enforcement as well. Um, I also asked them today, they didn't provide any assurance that there wouldn't be action. Exactly. Your Honor. I would also talk about, um, if it's helpful to the court, um, this is all post record. So it's, I don't think, I think we win regardless, but in advance of argument, I wanted to know what, what are people talking about today? What are the new issues that are not from 2020? Um, and the one that I thought was most interesting was artificial intelligence. Um, that matters a great deal to a great many industries that no one was talking artificial intelligence in 2020. Now that and cybersecurity are huge deals. Um, finally, real fast point on fiduciary duties. Um, Utah told them, Hey, you're going to put funds in a position where the squeakiest wheel gets the grease and they're going to put pressure on the fiduciary duty. And their response is, well, the fiduciary duty will hold maybe, but we're talking about trillions of dollars and thousands of funds. There's always a risk in a lot of large numbers that you're going to have dangers. So we asked the court to please vacate the, this portion of the categorization requirements of the rule. Um, we appreciate the court's indulgence. Thank you. All right, counsel. Thanks for you both. Uh, we do have some fascinating cases today. We appreciate your assistance. We are in recess until tomorrow at 9 a.m.